## BLUE EARTH COUNTY WELFARE DEPARTMENT v. JUANA CABELLERO AND OTHERS.

225 N. W. 2d 373.

December 20, 1974—No. 44743.

*Warren Spannaus,* Attorney General, and *Thomas L. Fabel,*

Deputy Attorney General, for appellant Department of Public Welfare.

*James H. Manahan,* for appellants Cabellero and others.

*Etzel & Harten, James C. Harten, John F. Corbey,* County Attorney, and *John C. Frentz,* Assistant County Attorney, for respondent.

Heard before Rogosheske, Peterson, MacLaughlin, Scott, and Knutson, JJ., and considered and decided by the court en banc.

KNUTSON, JUSTICE.*

This is an appeal from a judgment of the district court reversing a decision of the Minnesota commissioner of public welfare on the grounds that the commissioner's order was arbitrary and unreasonable within the meaning of Minn. St. 1971, § 256.77, subd. 3, in that it was based upon 42 USCA, § 1402(1), as amended by P. L. 92-213, § 9, 85 Stat. 776, which the trial court held violated the equal protection clause of the Fourteenth Amendment of the United States Constitution.

While the facts as related in the briefs seem extremely complicated, we think the case can be simplified by stating what the statutory provisions involved really accomplish.

In 1970, the Mankato Authority of the United States Department of Housing and Urban Development (hereinafter Mankato Authority) began construction of 141 units of public housing in Mankato. At that time the Blue Earth County Welfare Department (hereinafter county agency) paid shelter assistance based upon the actual cost of such shelter to a recipient up to a maximum of $162 for a family of four, consisting of $130 for rent and $32 for utilities. On November 20, 1970, the Blue Earth County Welfare Board agreed to pay rent to the Mankato Authority for the units under construction at its maximum rate. The Mankato housing opened for occupancy in May 1971. The county agency originally paid rent at the maximum rate agreed upon.

---

* Retired Chief Justice acting pursuant to Minn. St. 2.724.

The Housing Act of 1937[1] (the act was codified as 42 U. S. C. §§ 1401 to 1436) provided for Federal financial assistance in the form of loans, annual contributions, and capital grants to public housing agencies for low-rent housing programs. Federal subsidies were available only with respect to housing projects falling within the Federal definition prior to December 24, 1969. 42 USCA, § 1402(1), established four criteria for low-rent housing: (1) That it be decent, safe, and sanitary; (2) that rentals be within the reach of low-income families; (3) that dwellings in the project be available only to low-income families; and (4) that rents be fixed by the public housing agency and approved by the United States Housing Authority after taking into account the rent-paying ability of the family and financial stability and solvency of the housing project.

On December 24, 1969, Congress enacted what has been referred to throughout this case as the First Brooke Amendment, P. L. 91-152, § 213, 83 Stat. 389, which in effect excluded from the definition of low-rent housing those units the rents of which exceeded one-fourth of the tenant-family's income as determined by the Secretary of Housing and Urban Development. The effect of this act was to limit the amount of rent in a public housing unit to 25 percent of the tenant's income.

Application of that rent limitation to a tenant whose income consisted of public assistance benefits based in part on actual housing costs rather than upon a flat grant schedule would result in a reduction in his benefits. Consequently, he would accrue no economic advantage from the reduction of his rent. As a matter of fact, his public assistance benefits might be reduced to the point where even his lowered rent would exceed one-fourth of his income, calling for a further reduction in his rent and a corresponding readjustment of his public assistance benefits. In an attempt to avoid these side effects,[2] the First Brooke Amend-

---

[1] 50 Stat. 888, and acts amendatory thereof.

[2] See, Conference Report, 2 U. S. C. Cong. & Adm. News, 91st Cong. First Session, p. 1582.

ment exempted from the rent limitation the units of tenants who would suffer a reduction of public assistance benefits if their rent were reduced.[3]

In an apparent attempt to correct some of the difficulties created by the so-called First Brooke Amendment, Congress adopted P. L. 92-213, § 9, 85 Stat. 776, the so-called Second Brooke Amendment, which took effect on December 22, 1971, and was also directed toward coordinating the rent limitation of the First Brooke Amendment with the public assistance schemes of those states basing shelter grants upon actual housing costs. It repealed the exemption provision of the First Brooke Amendment and in its stead amended the definition of low-cost housing to prohibit public welfare agencies from reducing benefits to any tenant as a result of a rent reduction mandated by the First Brooke Amendment.[4]

While these statutes read in the abstract are somewhat difficult to comprehend, the legal effect of the First and Second Brooke Amendments may be simplified if we abandon the legal terminology used and view them from the standpoint of what they sought to accomplish. Putting the statutes in simple terms, under the First Brooke Amendment, those receiving shelter as-

---

[3] P. L. 91-152, § 213(b), 83 Stat. 389, provided in relevant part: "(b) * * * The requirement shall not apply in any case in which the Secretary of Housing and Urban Development determines that limiting the rent of any tenant or class of tenants as provided by such section 2(1), will result in a reduction in the amount of welfare assistance which would otherwise be provided to such tenant or class of tenants by a public agency."

[4] P. L. 92-213, § 9, 85 Stat. 776, added the following sentence to 42 USCA, § 1402(1): "Notwithstanding any other provision of Federal law or regulations thereunder, a public agency shall not reduce welfare assistance payments to any tenant or group of tenants in low-rent housing as a result of any reduction in rent resulting from the application of the rent limitation set forth in this paragraph (1) and required by such limitation."

sistance would receive comparable benefits whether they resided in private dwellings or in public housing. Under the Second Brooke Amendment, those residing in public housing, due to the limitation of the rent that could be charged, would receive an advantage from public welfare assistance in that the public agency could not reduce the assistance for rent even though the rent charged was less than the assistance granted. The result was that those living in public housing would in some cases receive more by way of assistance than they actually paid for rent, thus leaving an amount in excess of the rent payment which could be used for other purposes, while those living in private quarters would receive the amount actually paid for rent.

In February 1972, the Mankato Authority received HUD circular HM 7465.13, dated January 18, 1972, which set forth the provisions of the Second Brooke Amendment. The Mankato Authority consequently recomputed, effective December 22, 1971, the welfare assistance for rents for tenants in the Mankato project. The reduction was made retroactive to December 22, 1971, generally by means of credit against future rent. The county agency refused to abide by the so-called Second Brooke Amendment but instead reduced, effective May 1972, shelter grants to tenants of the Mankato Authority by an amount to correspond with the 25-percent rent limitation.

The Minnesota commissioner of public welfare issued a policy bulletin dated May 15, 1972, requiring the county welfare boards to comply with the Second Brooke Amendment. The county agency did not do so. An appeal was taken to the commissioner of public welfare by seven of the recipients affected, acting on behalf of approximately 20 in all. In October 1972, the Minnesota commissioner of public welfare entered an order requiring compliance with the policy bulletin. On appeal to the district court, the Minnesota commissioner of public welfare was reversed, the court holding that the so-called Second Brooke Amendment was arbitrary and unreasonable and violated the equal protection clause of the Fourteenth Amendment of the United States Con-

stitution. An appeal was taken here by several named individuals who are residents of public housing in Blue Earth County and who challenge the reduction of their shelter grants by the Blue Earth County Welfare Department on behalf of themselves and all persons similarly situated. The State Department of Public Welfare has also appealed. The Blue Earth County Welfare Department is respondent.

Our attention has been called to the fact that subsequent to the decision by the trial court but prior to hearing in this court, Congress enacted the Housing and Community Development Act of 1974 (P. L. 93-383, § 201, U. S. C. Cong. & Adm. News, 93d Cong. Second Session, p. 3267, signed into law by President Ford on August 22, 1974), which in effect repealed the two Brooke Amendments, the constitutionality of the second of which is the matter involved in this appeal. While we acknowledge notice of the passage of this later act, we do not believe it is necessary to consider the effect of it upon the appeal now before us.

The questions presented here are (1) whether the county agency has standing to challenge the constitutionality of the so-called Second Brooke Amendment, 42 USCA, § 1402(1), as amended by P. L. 92-213, § 9, 85 Stat. 776; (2) if it has such standing, whether the order of the commissioner of public welfare, which reversed the grant reduction by the county agency, was arbitrary or unreasonable; (3) whether 42 USCA, § 1402 (1), as amended by P. L. 92-213, § 9, 85 Stat. 776, violated the equal protection clause of the Fourteenth Amendment to the United States Constitution; and (4) whether 42 USCA, § 1402 (1), as amended by P. L. 92-213, § 9, 85 Stat. 776, violated the Tenth Amendment of the United States Constitution by usurping powers reserved to the states by that amendment.

1. Generally, with respect to a determination of standing to challenge the constitutionality of a legislative act where private parties are involved, under Federal decisions as announced by later cases, particularly Baker v. Carr, 369 U. S. 186, 204, 82 S. Ct. 691, 703, 7 L. ed. 2d 663, 678 (1962), the test is whether

such party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." The directness or lack thereof of the challenger's interest is also de-emphasized in the "injury in fact" test employed to determine whether a party has standing to challenge an agency action under the Federal Administrative Procedure Act.[5]

We also have recently evidenced a more expansive view of standing than we had in the earlier cases. In Snyder's Drug Stores, Inc. v. Minnesota State Board of Pharmacy, 301 Minn. 28, 221 N. W. 2d 162 (1974), we held that the Minnesota Public Interest Research Group had standing to challenge the drug price advertising regulations of the State Board of Pharmacy.

Involved in this appeal also is the test to be applied in determining whether public officials have standing to challenge the constitutionality of a statute under which they must act. The parties do not disagree as to the governing rule. In this area, the rule is clear—a public official charged with the performance of a ministerial duty will not be permitted to challenge the constitutionality of a statute imposing upon him that duty unless the case is one which affects the public interest. Village of Burnsville v. Onischuk, 301 Minn. 137, 222 N. W. 2d 523 (1974); Mower County Board v. Board of Trustees of PERA, 271 Minn. 505, 136 N. W. 2d 671 (1965); Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 132 N. W. 2d 183 (1964); Bricelyn School Dist. v. Board of County Commrs. 238 Minn. 63, 55 N. W. 2d 602 (1952); Loew v. Hagerle Brothers, 226 Minn. 485, 33 N. W. 2d 598 (1948). The rule was first enunciated in this court in State ex rel. Clinton Falls Nursery Co. v. County of Steele, 181 Minn. 427, 430, 232 N. W. 737, 738, 71 A. L. R. 1190, 1193 (1930), as follows:

"* * * [A]n official so charged with the performance of a

---

[5] 5 USCA, § 702.

ministerial duty will not be allowed to question the constitutionality of such a law. This rule is based largely upon governmental policy. It rests upon the theory that the court should accept as final the acts of the legislature and discourage attacks upon them except where necessary to protect the private interests of the individual asserting invalidity and peculiarly and particularly affected thereby. * * *

"There is * * * a well recognized exception to the foregoing rule when the rights of the state or the public interest are involved."

While there is a dispute as to whether the county agency's duties are purely ministerial, there appears to be no dispute as to the general rule. The main difficulty in a case such as this is in determining whether a sufficient public interest is involved to give the challengers of the constitutionality of the act standing to assert its unconstitutionality.

The trial court held that the parties involved did have standing, stating in part:

"* * * As permitted by the guidelines and regulations, Minnesota aid recipients receive sums totalled from two grants locally determined; one for shelter, the other for all other needs. Needs in each category are locally determined; aids to meet them are locally disbursed by County. * * * Aids locally disbursed by County come from federal grants, state revenues legislatively raised, and locally imposed County taxes. The largest program in 1972 was Aid for Dependent Children. County expenditures in it came, approximately, 57% from federal grant funds; balance equally from state and local County revenues. County determines Recipient needs within statewide guidelines, meets those needs within state criteria (which vary from area to area within the state), levies taxes to meet its share of the welfare expenditures it has determined, formulates budgets to meet anticipated resident Recipient needs, and has fiscal responsibility for accounting for, and disbursement of, funds to Recipients."

That some of the functions of the county welfare board are discretionary seems obvious. That the welfare board acts only in a ministerial capacity in other functions seems equally obvious. Appellants argue, with considerable persuasion, that the state agency promulgates the rules, regulations, and guidelines under which the local agency must operate and that the local agency's functions are purely ministerial. They argue that where state and local determinations clash, the determination of the state agency is controlling. The statutes seem to support that contention and they grant the state agency the power to regulate so as to assure that Federal matching funds are not lost and, at one point, even provided that mandamus will lie against the local agency to compel compliance with the statutes relating to old age assistance.[6] See, Cook v. Trovatten, 200 Minn. 221, 274 N. W. 165 (1937).

The language of the state department's bulletin with respect to the Second Brooke Amendment was most explicit. It provided:

"Welfare recipients presently living in public housing shall have their shelter allowance based upon the rent rates of the housing unit as of December 22, 1971."

This seems to give the local agency no discretion as to whether it could reduce the shelter payments so as to correspond with the rent actually paid.

With respect to a determination of whether there is a public interest involved, it is argued that inasmuch as the Second Brooke Amendment has now, for all practical purposes, been repealed, there is no longer a public interest involved. While this is quite persuasive, there remains the question of retroactive payments due to the failure of the county board to comply with the state agency's regulation and the Second Brooke Amendment until the amendment was modified.

Thus, while there is considerable doubt under our decisions whether the county agency has standing to challenge the consti-

---

[6] Minn. St. 1971, § 256.35.

tutionality of the Second Brooke Amendment, we have decided the question is sufficiently doubtful so that we should resolve the doubt in favor of a decision on the merits. While the rules are clear, the application of them is far from clear, and our decisions are not always easy to reconcile. Compare, for instance, Village of Burnsville v. Onischuk, *supra;* Loew v. Hagerle Brothers, *supra;* Port Authority of City of St. Paul v. Fisher, *supra;* with Mower County Board v. Board of Trustees of PERA, *supra;* and State ex rel. Clinton Falls Nursery Co. v. County of Steele, *supra.*

It might also be mentioned that the Minnesota Legislature by L. 1973, c. 717, repealed the provisions of Minnesota laws providing for categorical aid to the aged and to the disabled so that those persons, like AFDC recipients, will recover benefits under the General Assistance Article of L. 1973, c. 650, Art. XXI, §§ 1 to 30 (codified in part as Minn. St. c. 245A). The result is that this decision will have a limited impact upon any future determination of similar questions. Approximately $20,000 of back welfare benefits are at stake and that is probably the extent of the public interest involved.

2. Appellants allege that the district court exceeded its proper scope of review in reversing the order of the commissioner of public welfare on constitutional grounds. Minn. St. 1971, §§ 256.21, subd. 2, and 256.77, subd. 3, permit the district court to reverse an order of the commissioner if that order is "fraudulent, arbitrary, or unreasonable." Appellants contend that this language severely restricts the power of the district court to substitute its judgment for that of the administrative agency with respect to issues of law as well as issues of fact. Since the state agency was charged with implementing the "state plan" required to receive Federal matching funds for OAA and AFDC, appellants argue, the state agency should have the power to compel all local subdivisions to comply with the Federal act. This power implies, they contend, a power to interpret the constitutionality of the Federal statute, and they then conclude that the commis-

sioner's order should not be overturned on constitutional grounds so long as it has a "rational basis in law." That rational basis, according to appellants, is the Federal statute itself.

In support of this argument, appellants cite Dobson v. Commr. of Int. Rev. 320 U. S. 489, 64 S. Ct. 239, 88 L. ed. 248 (1943); Stronge & Lightner Co. v. Commr. of Taxation, 228 Minn. 182, 36 N. W. 2d 800 (1949); and Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 14 N. W. 2d 923 (1944). They allege that these decisions support the proposition that a reviewing court should not substitute its judgment for that of the administrative agency as to questions of law. The cases do not support their position. Rather, Dobson is famed for first adopting the rule that when hearing appeals from the United States Tax Court, which is endowed with special expertise, the reviewing court should not substitute its judgment for that of the agency as to mixed questions of law and fact. In Duluth-Superior Dredging Co. v. Commr. of Taxation, 217 Minn. 346, 14 N. W. 2d 439 (1944), this court adopted the same rule with respect to appeals from the district court from the Board of Tax Appeals (now the Tax Court). Village of Hibbing v. Commr. of Taxation followed that rule. In Duluth-Superior Dredging Co., this court relied not only upon Dobson, but upon a special review statute governing the appeals. Rather than prohibiting the district court from reviewing pure questions of law, the statute required it, limiting the scope of review as to questions of fact and mixed questions of law and fact only. Minn. St. 271.10, subd. 1, provides in part:

"* * * Such review may be had on the ground that the tax court was without jurisdiction, that the order of the tax court was not justified by the evidence *or was not in conformity with law, or that the tax court committed any other error of law.*" (Italics supplied.)

The Dobson rule was abandoned when Congress amended the Internal Revenue Code to require the reviewing court to apply

the same standard that is applied in reviewing decisions in civil cases tried without a jury.[7] The Minnesota court also abandoned the rule in Stronge & Lightner Co. v. Commr. of Taxation, *supra*, on which appellants rely. The cases are fully discussed in that decision and need not be repeated here.

The cases cited by appellants do not stand for the proposition that a reviewing court should defer to an administrative agency with respect to pure questions of law. There appear to be no cases which advance such a proposition. The Dobson doctrine,[8] even if still the law, is clearly inapplicable here.

3. It should be noted at the outset that respondent has alleged that the Second Brooke Amendment violates either the equal protection clause of the Fourteenth Amendment or the due process clause of the Fifth Amendment to the United States Constitution. Respondent apparently does so on the theory that, if state action is lacking and the Fourteenth Amendment therefore is held inapplicable, the protection of the Fifth Amendment would remain because the Second Brooke Amendment is a Federal statute. Since appellants no longer urge a lack of state action, we will treat the constitutional issue as a Fourteenth Amendment question and will assume that state action is present.

Appellants contend that the trial court erred in holding that the Second Brooke Amendment violated the equal protection clause of the Fourteenth Amendment. The parties agree that the effect of the amendment is to create a classification between welfare recipients who live in private housing and those who live in public housing. As we have said above, tenants in public housing under the Second Brooke Amendment would receive shelter grants which were larger than their rent, while tenants of private housing received grants which could never exceed their actual rent. Thus, tenants of public housing received extra disposable income. Appellants contend, however, that the classi-

---

[7] 62 Stat. 991 (1948).

[8] For a thorough discussion of the Dobson doctrine and its problems, see, 4 Davis, Administrative Law Treatise, § 30.03.

fication is not without rational basis and does not result in arbitrary and invidious discrimination against tenants of private housing. Respondent alleges, and the trial court held, that the classification is arbitrary and not rationally related to any proper legislative purpose.

The standard to be applied when measuring the classifications created by a public welfare benefit scheme against the equal protection clause is established in Jefferson v. Hackney, 406 U. S. 535, 92 S. Ct. 1724, 32 L. ed. 2d 285 (1972); Dandridge v. Williams, 397 U. S. 471, 90 S. Ct. 1153, 25 L. ed. 2d 491 (1970); Shapiro v. Thompson, 394 U. S. 618, 89 S. Ct. 1322, 22 L. ed. 2d 600 (1969). The so-called "rational basis" test of equal protection is always a relatively easy test to meet for those who seek to uphold the validity of a statutory classification. See, e. g., San Antonio Independent School Dist. v. Rodriguez, 411 U. S. 1, 93 S. Ct. 1278, 36 L. ed. 2d 16 (1973); Williamson v. Lee Optical Co. 348 U. S. 483, 75 S. Ct. 461, 99 L. ed. 563 (1955); Lindsley v. Natural Carbonic Gas Co. 220 U. S. 61, 31 S. Ct. 337, 55 L. ed. 369 (1911). When classifications created by public welfare schemes have been before the United States Supreme Court, the traditional standard has been relaxed still further.

Respondent relies on Shapiro v. Thompson, *supra*, in which the court struck down a 1-year residence requirement for welfare benefits as violative of the Fourteenth Amendment equal protection clause. Resondent's reliance on this case is misplaced. In Dandridge v. Williams, 397 U. S. 471, 484, note 16, 90 S. Ct. 1153, 1161, 25 L. ed. 2d 491, 501, the court distinguished Shapiro because the classification created by the statutory scheme had impinged upon the constitutionally protected right to travel and thus was subject to strict scrutiny. In Dandridge, the court upheld a maximum grant regulation of the Maryland public welfare authority, which placed a per-family maximum on the amount of benefits receivable. It was alleged that this discriminated against persons with large families. In upholding the regulation, the court stated:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co.* v. *City of Chicago*, 228 U. S. 61, 69-70. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland*, 366 U. S. 420, 426." 397 U. S. 485, 90 S. Ct. 1161, 25 L. ed. 2d 501.

As a rational basis, the court in Dandridge posited a desire on the part of the state regulatory authorities to create an incentive to seek employment and to avoid an imbalance between the incomes of welfare recipients and the working poor. The fact that some recipients were unemployable would not destroy that rational basis according to the court.

More recently in Jefferson v. Hackney, *supra,* the United States Supreme Court upheld a Texas welfare scheme which allegedly discriminated against AFDC recipients in favor of the recipients of other types of categorical aid. Since sufficient funds were not available to provide benefits to all recipients at a level equal to their demonstrated need, the state established a percentage reduction factor to be applied to apportion the available benefits among the various recipients. AFDC recipients were paid only 75 percent of need while the aged received 100 percent of need and the blind and the disabled received 95 percent of need. In upholding the scheme as not violative of the equal protection clause of the Fourteenth Amendment, the court noted that the state might have believed that the aged and infirm were less able to bear the rigors of poverty than the usually young and healthy AFDC recipients. This was a sufficient nexus between

the legislative purpose of alleviating poverty and the classification established by the benefit scheme to constitute the required rational basis.

The trial court applied the standard established by these decisions in rendering his decision, but held that a rational basis was lacking in the instant case.

Two possible rational bases appear in the record to justify the result. First, appellants, relying on the purpose clause in the Federal legislation,[9] contend that the classification serves the purposes of the Federal act by encouraging welfare recipients to select public rather than private housing and thus help assure that low-income persons enjoy quality housing. Appellants consider the surplus of shelter grant over rent to be a sort of bonus to induce recipients to make a choice they might not make without the financial incentive. The local agency suggests that this is an insufficient basis to sustain the classification. It argues that if public housing is in fact of higher quality, such incentives will be unnecessary, and that if it is of lower quality than private housing, such incentives will be undesirable.

The second possible basis, not argued in appellants' brief but considered by the court below and discussed by Senator Brooke in his Senate testimony, concerns the need to coordinate the provisions of the Federal act with the practices of the state welfare authorities. Since the Federal statute provided that rents for public housing could not exceed 25 percent of the tenant's income, the reduction of shelter grants in response to a reduction in benefits could lead to the so-called spiral effect. When the tenant's total income was reduced by the adjustment of his shelter grant, his rental might once again exceed 25 percent of his income, and the public housing authority would again be required to lower

---

[9] "* * * [T]o remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm, and Indian areas, that are injurious to the health, safety, and morals of the citizens of the Nation." 42 USCA, § 1401.

his rent. The local welfare agency would then reduce his shelter grant once more, and the cycle would repeat itself. Senator Brooke feared that the public housing authorities might lose a substantial amount of revenue from that spiral effect. The trial court held that this possibility did not create a rational basis for the classification, noting:

"It is argued a troublesome 'spiral effect' will burden local HUD agents and County if the latter's position be upheld. The cognizant agencies should be able to avoid that tangle, feared because of the interrelationship between rentals pegged to a percentage of income while income, in turn, is fixed at rent 'as paid'. Ultimately, rentals fixed at 25% of income will reach a level approximating 33% of general needs grants for Recipient tenants in HUD housing. It should be possible for agency personnel to mathematically calculate that level, set rentals and related shelter grants, and be done with the matter."

The difficulty with the responses to both of these alleged bases is that the responses do not claim that the proffered justifications of the classifications are irrational and without any basis, but, rather, they quarrel with the bases on the merits. This is not the appropriate test. It is not necessary that Congress have been right in its belief that such an amendment would encourage the use of high-quality public housing and prevent the loss of revenues from the spiral effect. It is merely necessary that Congress might rationally have believed that to be the case. The appropriate test is set forth in Dandridge:

"* * * [T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61. It is enough that the State's action be rationally based and free from invidious discrimination. The regulation before us meets that test.

"We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives

that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court." 397 U. S. 486, 90 S. Ct. 1162, 25 L. ed. 2d 503.

Little is served by referring to lower Federal and state supreme court cases for guidance as to whether the justification offered by appellants is sufficient, for none of the reported cases is on point. The scheme involved here is unique in that, unlike the various other welfare regulations which have at various times been alleged to violate the equal protection clause, the Second Brooke Amendment did not result in any recipient receiving welfare benefits at a level below his need. On the contrary, the result was that some recipients received benefits at a level in excess of established need. It would seem much more difficult to make a showing of invidious discrimination where there is no alleged denial of welfare benefits but rather an alleged overpayment. We hold the Second Brooke Amendment did not violate the equal protection clause of the Fourteenth Amendment.

4. The local agency contends that the Second Brooke Amendment constitutes an attempt by Congress to usurp powers reserved to the states by the Tenth Amendment to the United States Constitution. The trial court did not reach this issue because it held that the statute violated the equal protection clause of the Fourteenth Amendment. Inasmuch as it has been raised here, we will dispose of it.

Respondent points to the differences between the language of the Second Brooke Amendment as enacted[10] and an earlier

---

[10] "Notwithstanding any other provision of Federal law or regulation thereunder, a public agency shall not reduce welfare assistance payments to any tenant or group of tenants in low-rent housing as a result of any reduction in rent resulting from the application of the rent limi-

draft.[11] The latter was expressly limited to public assistance programs involving Federal financial participation. The former contains no such express limitation.

Respondent alleges that the General Welfare Clause of Art. I, § 8, of the United States Constitution did not give Congress the power to legislate for the general welfare, but merely to spend Federal moneys in programs that promote the general welfare. It relies on United States v. Butler, 297 U. S. 1, 56 S. Ct. 312, 80 L. ed. 477 (1936), in which the United States Supreme Court held the Agricultural Adjustment Act unconstitutional. To the extent that the prohibition on reduction of welfare benefits applies to programs exclusively funded by state and local moneys, respondent alleges it is outside the power conferred upon Congress by Art. I, § 8, and violates the reserve clause of the Tenth Amendment.

There are two difficulties with this argument which make it worthy of only cursory consideration. First, there is no showing that the statute is to be interpreted so as to apply to all programs regardless of whether there is Federal financial participation. Second, there was Federal financial participation in the programs at issue here. The legislative history set forth by respondent would indicate an intent on the part of Congress to limit the applicability of the provision to programs in which such participation was present.

5. There is still another cogent reason why we should be reluctant to hold the Second Brooke Amendment unconstitutional. A great deal of the money that is involved in OAA and AFDC

tation set forth in this paragraph (1) and required by such limitation." P. L. 92-213, § 9, 85 Stat. 776.

[11] "In the case of families receiving public assistance in the form of money payments under any State program with respect to which there is Federal financial participation, the total amount of their benefits thereunder shall not be reduced as a result of any reduction in rent by a local public housing agency made in conformity with the applicable rent ceiling established in accordance with the preceding paragraph." 116 Cong. Rec. 33503 (1970).

comes from Federal funding. A strong presumption exists that acts of Congress are constitutional and that when Congress legislates as it has done, it does not exceed its power to do so. The courts, and we think particularly the state courts, have an obligation to construe acts of Congress as constitutional whenever possible. In the case of United States Civil Service Comm. et al. v. National Assn. of Letter Carriers, AFL-CIO, 413 U. S. 548, 571, 93 S. Ct. 2880, 2893, 37 L. ed. 2d 796, 812 (1973), the Supreme Court of the United States said:

"* * * As we see it, our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations."

See, also United States v. Thirty-seven Photographs, 402 U. S. 363, 91 S. Ct. 1400, 28 L. ed. 2d 822 (1971).

In the case of Union Pacific R. Co. v. United States (Sinking Fund Cases), 99 U. S. 700, 718, 25 L. ed. 496, 501 (1879), the United States Supreme Court said:

"It is our duty, when required in the regular course of judicial proceedings, to declare an Act of Congress void if not within the legislative power of the United States; but this declaration should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the Government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule."

In the case of Flemming v. Nestor, 363 U. S. 603, 617, 80 S. Ct. 1367, 1376, 4 L. ed. 2d 1435, 1448 (1960), the United States Supreme Court stated:

"We observe initially that only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground. Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind

objective manifestations it becomes a dubious affair indeed. Moreover, the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it. '[I]t is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void.' *Fletcher v. Peck,* 6 Cranch 87, 128."

These cases are especially applicable to statutes involving welfare where Federal money constitutes so large a portion of the assistance. In this area we should hesitate to hold an act of Congress unconstitutional.

In light of the presumed constitutionality of the Second Brooke Amendment, it seems quite clear that the respondent in this case has not met its burden of proving such unconstitutionality. The applicability of the Second Brooke Amendment to a program financed solely by state or local funds is not before us. The only question we have to consider is whether the act under which Federal funds furnish a large part of the total amount used to finance these programs is a violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. Clearly, it has not been proven to be so.

Reversed with instruction to reinstate the decision of the commissioner of public welfare.

MR. CHIEF JUSTICE SHERAN took no part in the consideration or decision of this case.