**In the Matter of STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and Allstate Insurance Company.**

No. C3–86–345.

Court of Appeals of Minnesota.

Aug. 19, 1986.

James P. Loken, Joseph H. Otterstetter, Faegre & Benson, Minneapolis, for Relator State Farm.

Hubert H. Humphrey, III, Atty. Gen., Gregory P. Huwe, Sp. Asst. Atty. Gen., St. Paul, for respondent Dept. of Commerce.

Joe A. Walters, Lawrence A.G. Moloney, Mark J. Ayotte, O'Connor & Hannan, Minneapolis, for Relators Allstate and American Family Mut. Ins. Co.

William R. Sieben, Peter H. Berge, Schwebel, Goetz, Sieben & Hanson, P.A., Minneapolis, for respondent-intervenor MN Trial Lawyers Ass'n.

Heard, considered, and decided by PAR-KER, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

WOZNIAK, Judge.

During the 1985 Regular Session and the 1985 First Special Session of the Minnesota Legislature, four amendments to the Minnesota No-Fault Automobile Insurance Act, Minn.Stat. ch. 65B, were enacted. One of these amendments directly contradicted the other three on the issue of whether "stacking" of underinsured and uninsured motorist coverages was permissible. Another provision is worded identically in all four amendments, but the parties to this appeal disagree on its interpretation, specifically, whether it allows insurers to combine underinsured and uninsured motorist insurance into a single coverage.

Petitioners State Farm Mutual Automobile Insurance Company, Allstate Insurance Company, and eight intervenor insurance companies appeal by writ of certiorari from a final decision of the Commissioner of Commerce in a contested case administrative hearing. The commissioner, rejecting the recommendation of the administrative law judge, concluded that he lacked jurisdiction to decide whether "stacking" of uninsured and underinsured coverage is prohibited by statute or whether insurers are required to offer mandatory stacking, and that uninsured and underinsured motorist coverage must be offered as separate coverages. We reverse, and order the commissioner to approve petitioners' policy forms as submitted.

## FACTS

1. *The stacking issue:* The 1985 Minnesota Legislature enacted two amendments to the No-Fault Act in the regular session and two in the special session. The first, chapter 168 (the Seaberg-Petty bill), made underinsured motorist coverage mandatory and prohibited the "stacking" of uninsured and underinsured coverages. *See* 1985 Minn.Laws. ch. 168, § 11, Minn.

Stat. § 65B.49, subd. 4(1) & (6). The second, chapter 309, added technical amendments, which are not at issue here, to chapter 168. *See* 1985 Minn.Laws. ch. 309.

Because several major tax and appropriations bills were not passed during the 1985 regular session, a special session became necessary. Following the close of the regular session, the appropriations bill conference committees continued to meet in order to reach agreement on these major bills before the start of the special session. During the special session, proponents of stacking succeeded in adding a non-germane amendment to the House State Departments appropriations bill, which was then in conference committee. This amendment, special session chapter 13, required insurers to offer insureds an election to stack uninsured and underinsured coverage. *See* 1985 Minn.Laws 1st Spec.Sess. ch. 13. The amendment was added without consulting the authors of chapters 168 and 309. Under the special procedures governing the special session, conference committee reports were introduced as new bills in the special session, and no amendments were allowed on the House or Senate floor. Thus, opponents of stacking would have no opportunity to eliminate the mandatory offer provision by floor amendment. They had either to accept or reject the entire State Departments appropriations bill.

To overcome these procedural obstacles, opponents of stacking sought to restore the anti-stacking provisions enacted in the regular session through an amendment to the Semi-States appropriations bill then under consideration. This amendment, special session chapter 10, contained three provisions. First, Minn.Stat. § 65B.49, subd. 4 was rewritten as Minn.Stat. § 65B.49, subd. 3a, using the identical anti-stacking language of chapter 168. *See* 1985 Minn. Laws. 1st Spec.Sess. ch. 10, § 68, Minn. Stat. § 65B.49, subd. 3a. Second, Minn. Stat. § 65B.49, subd. 4, the statute amended by the State Departments bill, was repealed. *Id.* § 123, subd. 5. Third, because the order of passage of appropriations bills in a special session is unpredictable, the

amendment contained a "repealer" provision, which stated:

> Any amendment to Minnesota Statutes, section 65B.49, subdivision 4, enacted at the same special session that enacts this subdivision, is void.

*Id.*

When Representative Seaberg, the author of chapter 168, submitted this amendment to the Semi-States conference committee, of which he was a member, the House conferees were supportive. However, Representative Seaberg learned that a majority of the Senate conferees would not support the amendment unless it was first endorsed by the full Senate DFL Caucus.

The bill was presented to the Senate DFL Caucus on the morning of the first day of the special session. Proponents and opponents of stacking argued their positions. Senator Petty, the chief Senate author of no-fault reform, and the caucus chairman both explained that the effect of the amendment would be to restore the anti-stacking provision enacted in the regular session and to nullify the conflicting mandatory offer provision in the State Departments bill. The caucus voted to support Representative Seaberg's amendment to the Semi-States bill. The amendment was also fully explained to the House IR Caucus.

The two appropriations bills were enacted into law without further amendment to their stacking provisions. The Semi-States bill, S.F. 24, passed the House and the Senate on June 20, 1985. The State Departments bill, H.F. 16, passed the House on June 20 and the Senate on June 21. Both bills were enrolled by the Revisor of Statutes and signed by the legislative leaders on June 21. Both bills were sent to the Governor on June 24.

According to a memorandum from Ed Hunter of the State Planning Agency to Tom Triplett of the Governor's staff, the Department of Commerce preferred the pro-stacking provision in the State Departments bill. The Department of Commerce therefore urged that this bill be signed by the Governor after the Semi-States bill. The Governor's staff instead recommended that the Governor sign the bills in their "natural" order of passage so that "the Governor can thus avoid supporting one position or the other."

The two appropriations bills were signed by the Governor and filed by the Secretary of State on June 27, 1985. The Governor's Deputy Chief of Staff testified at the contested case hearing that the Governor signed the Semi-States bill "shortly" before he signed the State Departments bill.

The two signed bills were then taken to the Secretary of State's office, with a recommendation from the State Planning Agency that the State Departments bill receive a higher chapter number than the Semi-States bill. The Secretary of State assigned the Semi-States bill chapter number 10, and the State Departments bill chapter 13.

2. *The single coverage issue:* With regard to the issue whether uninsured and underinsured motorist insurance should be a single coverage or separate coverages, there is no question which statutory language governs. All four bills at issue here contain the identical language on this issue; the only question is the proper interpretation of that language.

3. *The contested case hearing:* In July of 1985, following the passage of both bills, State Farm filed its policy forms regarding uninsured and underinsured motorist coverage with the Department of Commerce, Insurance Division, pursuant to Minn.Stat. § 70A.06, subd. 2 (1984). This filing included the newly mandated underinsured motorist coverage, but combined it with uninsured motorist coverage into a single coverage. It also provided no option for stacking.

The department rejected State Farm's filing because it did not provide separate underinsured and uninsured coverages and because it did not offer insureds the option to "stack" these coverages. State Farm thereupon filed a request for hearing pur-

suant to Minn.Stat. § 70A.22, subd. 1 (1984).

The same issues arose regarding Allstate, which filed a separate request for hearing. The commissioner issued a Notice of and Order for Hearing, Order to Show Cause and Statement of Charges. The State Farm and Allstate hearings were subsequently consolidated, and intervention was granted to eight other insurance companies and the Minnesota Trial Lawyers Association (MTLA).

Following an evidentiary hearing, the administrative law judge filed his Findings of Fact, Conclusions of Law, Order, and Memorandum. The ALJ concluded that the "pro-stacking" provisions of special session chapter 13 (the State Departments bill) are irreconcilable with the "anti-stacking" provisions of special session chapter 10 (the Semi-States bill); that the effective statute is chapter 10; and that the legislature intended uninsured and underinsured motorist coverage to be a single coverage, and not separate coverages. The ALJ recommended that the Commissioner of Commerce allow insurers to file insurance policies combining underinsured and uninsured coverages as a single coverage, and not containing any optional stacking provision or offer to policyholders to stack these coverages.

4. *The Commissioner's decision:* The Commissioner of Commerce rejected the ALJ's recommendation. In his Findings of Fact, Conclusions of Law and Order dated January 30, 1986, the Commissioner concluded that neither he nor the ALJ had jurisdiction to determine the stacking issue, and that uninsured and underinsured motorist coverages are separate coverages, not a single coverage.

The commissioner ordered that policy forms providing No-Fault coverages must contain separate uninsured and underinsured coverages. He also ordered that an insurer is not required to file policies or riders with the commissioner which provide for stacking of underinsured and uninsured coverages if the insurer does not offer and therefore sell the stacking option to its insureds.

State Farm, Allstate, and the intervenor insurers petitioned this court for a writ of certiorari, pursuant to Minn.Stat. § 70A.22, subd. 3 (1984); *id.* § 14.63; and Minn.R. Civ.App.P. 115.01, of the commissioner's final decision as embodied in his January 30 findings, conclusions, order, and memorandum. This court issued the writ of certiorari on February 28, 1986.

## ISSUES

1. Are petitioner insurance companies aggrieved by the final decision of the Commissioner of Commerce that he is without jurisdiction to decide whether, under the 1985 amendments to the No-Fault Act, insurers are prohibited from offering, or required to offer, insureds the opportunity to "stack" uninsured and underinsured motorist coverages?

2. Did the Commissioner of Commerce err in determining that he lacks jurisdiction, in a Minn.Stat. § 70A.06, subd. 2 proceeding, to determine whether automobile insurers in Minnesota must issue policies that offer insureds the option to "stack" uninsured and underinsured motorist coverages?

3. Should this court decide the merits of the "stacking" issue?

4. What is the effective statute governing the filing requirements of insurers with regard to the stacking of uninsured and underinsured motorist coverages?

5. Do the 1985 amendments to the No-Fault Act require insurers to provide the mandatory uninsured and underinsured motorist coverage as a single coverage or as separate coverages?

6. Is the testimony of individual legislators admissible to ascertain the intent of the legislature?

## ANALYSIS

1. The Administrative Procedure Act provides that "[a]ny person aggrieved by a final decision in a contested case is entitled to judicial review" by writ of certiorari.

Minn.Stat. § 14.63 (1984). The commissioner argues that the insurers are not aggrieved by his decision that he lacks jurisdiction to decide the stacking issue. This argument is without merit.

A party is aggrieved, for purposes of judicial review, by a final decision of an agency when that party:

> is injuriously or adversely affected by the judgment or decree when it operates on his rights of property or bears directly upon his personal interest.

*In re Getsug,* 290 Minn. 110, 114, 186 N.W.2d 686, 689 (1971).

■ The requirement that a party seeking judicial review of agency action be aggrieved by that action embodies the general concept of standing. The central principle of standing is that:

> [o]*ne who is adversely affected in fact by governmental action has standing to challenge its legality, and one who is not adversely affected in fact lacks standing.*

4 K.C. Davis, *Administrative Law Treatise* § 24:2, at 212 (1983) (emphasis in original).

The commissioner argues that the insurers are not aggrieved because the net effect of his decision is to allow petitioners to issue policies that do not offer the option of stacking. This is not true.

Minn.Stat. § 70A.06 (1984) provides:

> ' Subd. 2. No policy form shall be delivered or issued for delivery unless it has been filed with the commissioner and either (i) he has approved it or (ii) 30 days have elapsed and he has not disapproved it * * *.

*Id.* This court has held that a policy or endorsement disapproved by or not filed with the commissioner, pursuant to section 70A.06, is void and unenforceable. *Sawyer v. Midland Insurance Co.,* 383 N.W.2d 691, 695 (Minn.Ct.App.1986), *pet. for rev. granted* (Minn. May 16, 1986).

■ Here, the commissioner expressly disapproved the policies within 30 days of

filing. The effect of this express disapproval is to render the policies at issue void and unenforceable. The commissioner's subsequent inaction and attempted abdication of jurisdiction on this issue do not operate as an approval of the policies within the clear statutory mechanism of section 70A.22.[1]

Under these circumstances, it cannot be argued that the insurers are not aggrieved by the commissioner's decision.

Moreover, other elements of the standing requirement have been met here. Petitioners have exhausted their administrative remedies, *see McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); their interests are within the "zone of interests" protected and regulated by the statute in question, *see Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970); and finally, the procedural history of this case clearly reveals the commissioner's position on the stacking issue and the parties' fundamental disagreement on it. This assures this court of "that concrete adverseness which sharpens the presentation of issues" and "is the gist of the question of standing." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

2. The commissioner's decision that he is without jurisdiction to decide the stacking issue is a question of law, and this court therefore need give no deference to the commissioner's decision on the issue. *See Frost-Benco Electric Association v. Minnesota Public Utilities Commission,* 358 N.W.2d 639, 642 (Minn.1984).

The extent of jurisdiction bestowed upon the commissioner is measured by the statutes from which he derives his authority. Minn.Stat. § 60A.03, subd. 2(1) (1984) provides:

> The commissioner shall have and exercise the power to enforce all the laws of this state relating to insurance, and it shall be his duty to enforce all the provi-

---

1. A party may be aggrieved by agency action unlawfully withheld, as well as by such action

unlawfully exercised. *Nader v. FCC,* 520 F.2d 182, 206 (D.C.Cir.1975).

sions of the laws of this state relating to insurance.

*Id.* Minn.Stat. § 70A.06 (1984) bestows upon the commissioner the power and the duty to review and approve all policy forms issued in Minnesota.

■ The commissioner's jurisdiction to make a decision on the stacking issue is implied from these express powers. Generally,

[n]either agencies nor courts may under the guise of statutory interpretation enlarge the agency's powers beyond that which was contemplated by the legislative body.

*Waller v. Powers Department Store,* 343 N.W.2d 655, 657 (Minn.1984). However, "express statutory authority need not be given a cramped reading ′* * *.″ *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 369 N.W.2d 530, 534 (Minn.1985). In determining whether a power is implied from an agency's express powers, this court "must look at the necessity and logic of the situation." *Id.*

Here, it is clear that the commissioner must necessarily make a decision on the stacking issue in order to carry out his express statutory duties. If insurers are required to offer optional stacking, they must provide for it in their policy forms. If, on the other hand, stacking is prohibited by law, any policy providing for it is unlawful. Either way, the commissioner must make a decision on the issue in order to carry out his duty to prevent unlawful policy forms being issued in Minnesota.

■ 3. The commissioner argues that, if this court holds that he has jurisdiction to decide the stacking issue, the case should be remanded for consideration by the ·commissioner. Ordinarily, before judicial review of an agency decision will be permitted, the appropriate administrative remedies must be exhausted. *City of Richfield v. Local No. 1215, International Association of Firefighters,* 276 N.W.2d 42, 51 (Minn.1979).

However, this rule is not absolute; it is tempered by practicality. The doctrine of exhaustion of administrative remedies

is not applicable where it would be futile to seek such redress; consequently, a party so situated may go to the courts for redress.

*Id.*

Here, it would clearly be futile to remand this issue for another determination by the Commissioner of Commerce. The commissioner has already made his position on the stacking issue very clear: first, in his department's efforts, through the State Planning Agency, to have the State Departments appropriations bill signed first by the Governor and assigned a higher special session chapter number by the Secretary of State; second, by his express disapproval of petitioners' policy forms for the stated reason that they did not offer optional stacking; third, by his position throughout the contested case hearing; and finally, by his argument before this court that, should this court reach the merits of the issue, this court should hold that insurers must offer optional stacking of uninsured and underinsured coverages. In light of this history, it cannot be argued that a remand is necessary to ascertain the commissioner's position on this issue. *Cf. State Board of Medical Examiners v. Olson,* 295 Minn. 379, 387, 206 N.W.2d 12, 17 (1973). It would be fruitless to remand here, where the issue involved is one of law which must ultimately be determined by the appellate courts, and on which this court is not obliged to defer to the department's expertise. *See No Power Line, Inc. v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 320 (Minn.1977); *Blue Earth County Welfare Department v. Caballero,* 302 Minn. 329, 341, 225 N.W.2d 373, 380 (1974). A remand would serve only to delay the ultimate resolution of this issue.

4. The issue whether stacking of uninsured and underinsured coverages is prohibited, or whether insurers are required to offer insureds the option to stack these coverages, turns on which of the two amendments to the No-Fault Act enacted in the 1985 special session is controlling.

Ordinarily, where two statutes on the same subject are enacted in the same session, and especially when they are enacted on the same day, they should be construed, so far as possible, to harmonize and give force and effect to the provisions of each. *Ausman v. Hoffman*, 208 Minn. 13, 17, 292 N.W. 421, 423 (1940).

Here, however, the two statutes are irreconcilable and cannot be harmonized. On the one hand, 1985 Minn.Laws 1st Spec. Sess. ch. 10, § 68, Minn.Stat. § 65B.49, subd. 3a(6) provides:

> Regardless of the number of policies involved, vehicles involved, persons covered, claims made, vehicles or premiums shown on the policy, or premiums paid, in no event shall the limit of liability for uninsured and underinsured motorist coverages for two or more motor vehicles be added together to determine the limit of insurance coverage available to an injured person for any one accident.

*Id.* On the other hand, 1985 Minn.Laws 1st Spec.Sess. ch. 13, § 191, Minn.Stat. § 65B.49, subd. 4(6) provides:

> Unless a policyholder makes a specific election to have two or more policies added together, the limit of liability for uninsured and underinsured motorist coverages for two or more motor vehicles may not be added together to determine the limit of insurance coverage available to an injured person for any one accident. An insurer shall notify policyholders that they may elect to have two or more policies added together.

*Id.* These two provisions cannot be reconciled. Chapter 10 is an absolute prohibition on stacking of uninsured and underinsured coverage; chapter 13 requires insurers to offer their policyholders an election to stack.

In his memorandum, the administrative law judge stated the overriding issue as follows:

The ultimate purpose of this proceeding is to determine legislative intent which is the controlling factor here. While there are two fairly complex issues involving legislative mechanics which must be resolved (the "Order of Passage" rule and the rule against "Prospective Repealers"), this opinion has been guided by the overriding and central proposition that the object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. Minn.Stat. § 645.16. It is this overriding concept which governs in applying the two rules which will be discussed in some detail below.

The commissioner asserts that the controlling statute is chapter 13 for two reasons. First, the "order of enactment" rule requires that the last-enacted law prevail; and second, that the "prospective repealer" contained in chapter 10 is invalid as a matter of law. Both these arguments fail.

### a. *The "order of enactment" rule:*

Normally, where two laws passed in the same session are irreconcilable, "the law latest in *date* of final enactment * * * shall prevail." Minn.Stat. § 645.26, subd. 3 (1984) (emphasis added). Here, chapter 10 and chapter 13 were enacted on the same date.[2] Where two irreconcilable laws are passed on the same date, it is presumed that the acts were approved in their numerical order. *Syndicate Printing Co. v. Cashman*, 115 Minn. 446, 450, 132 N.W. 915, 916–17 (1911). Thus, there is a presumption in this case that the higher session law chapter number prevails.

■ However, strict application of the order of enactment rule is not justified where it is clear that the legislative intent would thus be subverted. In *Allen v. Holm*, 243 Minn. 96, 66 N.W.2d 610 (1954), the supreme court held that a nominating

---

**2.** Minnesota Statutes section 645.01 defines "final enactment" and "enacted finally" as "the time when the procedure required by the constitution for the enactment of a bill into a law has been complied with." Under the Minnesota Constitution, the final step required for the enactment of a bill into law is the signature of the Governor. Minn. Const. art. 4, § 23; *see State ex rel. Foster v. Naftalin*, 246 Minn. 181, 186, 74 N.W.2d 249, 254 (1956). In this case, therefore, both bills were enacted on the same date.

petition for the U.S. Senate was timely filed under a statute, notwithstanding that it was filed a day late under a more recent statute. The dissent argued that the two statutes were irreconcilable and that the more recently enacted must prevail. The majority noted that the canons of statutory construction are not ends in themselves, adding the following language to its opinion:

> Since the writing of this opinion the dissent of Mr. Justice Thomas Gallagher has appeared. We agree with the canon of statutory construction announced in his opinion to the effect that the latest of two inconsistent statutes controls. But such rules are merely an aid to the construction of the statutes and must yield where, as we feel in this case, the legislative intent can be clearly ascertained. As we stated in the case of *Winters v. City of Duluth*, 82 Minn. 127, 129, 84 N.W. 788, 789:
>
>> " * * * But 'canons of construction are not the masters of the courts, but merely their servants, to aid them in ascertaining the legislative intent'; and when it is ascertained the statute must be so construed as to give effect to such intention, even if it seem contrary to such rules and the strict letter of the statute."

*Id.* at 102–03, 66 N.W.2d at 614–15.

As the administrative law judge explained in his thoughtful and well-reasoned memorandum, the order of enactment rule should not be mechanically applied in this case because the intent of the legislature was clearly that the substantive provisions of 1985 Minn.Laws ch. 168 (the Seaberg-Petty bill), as reenacted in 1985 Minn.Laws

1st Spec.Sess. ch. 10 (the Semi-States bill), should be the law.

Chapter 168 dealt solely with the No-Fault Act. It was debated and amended in substantive committees of both houses and on the floors of both houses before being passed by both houses.

Special Session chapter 13, on the other hand, was introduced as an amendment to the State Departments bill, a major appropriations bill, without consulting the authors of chapter 168. Under the rules governing the special session, no floor amendments to the appropriations bill were allowed. Legislators had to vote for or against the entire State Departments bill, which funds much of the state government.[3]

Special Session chapter 10 was enacted in a similar manner. However, chapter 10 was introduced in clear response to chapter 13. Both majority caucuses were informed of the reasons for the "undoing" language of chapter 10; the Senate conferees on the Semi-States conference committee did not agree to it until after the entire Senate DFL caucus had voted their approval.

■ Based on these facts, we conclude that the intent of the legislature in the 1985 regular and special sessions was to enact the "anti-stacking" language contained in chapter 168 and chapter 10. Strict application of the "order of enactment" rule would be inappropriate under these circumstances, and especially in light of the fact that special session chapter 13 received a higher chapter number only through the intervention of the Department of Commerce and the State Planning Agency.

> Garbage or Christmas tree bills appear to be a direct, cynical violation of our constitution and however enticingly they may be drafted and whatever promises they contain, we must have the will and the courage to resist the temptation to affirm the legislative action. *State ex rel. Mattson v. Kiedrowski,* 391 N.W.2d 777 (Minn.1986) (Yetka, J., concurring specially, and joined by Simonett, J.).

---

**3.** The parties have not raised the issue whether such "garbage" or "Christmas tree" bills violate Minn. Const. art. 4, § 17, which provides: "No law shall embrace more than one subject, which shall be expressed in its title." Because we decide this case on the basis of statutory interpretation, we need not address this constitutional issue. We note, however, that two members of the Minnesota Supreme Court have expressed strong disapproval of the now-common practice of adding numerous nongermane amendments to major tax and appropriations bills:

It should be noted that, even if the "order of enactment" rule were strictly applied here, chapter 10 would prevail. This is because chapter 10 repealed Minn.Stat. § 65B.49, subdivision 4 of chapter 168, the provision which chapter 13, enacted after chapter 10, amended. Thus, when chapter 13 was enacted, there was no subdivision 4 left to amend. An amendment to a repealed act is a nullity.

b. *The "prospective repealer" issue:*

■ Because we hold that, under either a strict or liberal construction of the "order of enactment" rule, chapter 10 is the effective statute, it is unnecessary to address the issue whether the prospective repealer contained in chapter 10 is valid. We note, however, that there is authority for the proposition that the doctrine should not be strictly applied where the nullifying language is not drafted in anticipation of unknown future amendments, but in direct response to a contradictory amendment in another pending bill. *See Connecticut v. Schweiker,* 684 F.2d 979 (D.C.Cir.1982). Furthermore, the prospective repealer doctrine generally precludes a legislature from limiting the power of a future legislature. *See* 1A Singer, *Statutes and Statutory Construction* § 22.02 (4th ed. 1985). By its own language, the repealer in chapter 10 applies only to amendments "enacted at the same special session that enacts this subdivision." 1985 Minn.Laws 1st Spec. Sess. ch. 10, § 123, subd. 5.

5. With respect to the single coverage issue, all four of the statutes enacted by the 1985 legislature contain identical language. The language at issue provides:

Subd. 3a. UNINSURED AND UNDERINSURED MOTORIST COVERAGES. (1) No plan of reparation security may be renewed, delivered or issued for delivery, or executed in this state with respect to any motor vehicle registered or principally garaged in this state unless uninsured and underinsured motorist coverage are provided therein. The coverages combined, at a minimum, must provide limits of $25,000 because of injury to or the death of one person in any accident and $50,000 because of injury to or the death of two or more persons in any accident. In the case of injury to, or the death of, two or more persons in any accident, the amount available to any one person must not exceed the coverage limit provided for injury to, or the death of, one person in any accident. *For purposes of this subdivision, uninsured motorist coverage and underinsured motorist coverage shall be a single coverage.*

(2) Every owner of a motor vehicle registered or principally garaged in this state shall maintain uninsured and underinsured motorist coverages as provided in this subdivision.

(3) No reparation obligor is required to provide limits of uninsured and underinsured motorist coverages in excess of the bodily injury liability limit provided by the applicable plan of reparation security.

(4) No recovery shall be permitted under the uninsured and underinsured motorist coverage of this section for basic economic loss benefits paid or payable, or which would be payable but for any applicable deductible.

Minn.Stat. § 65B.49, subd. 3a. (1986) (emphasis added).

■ The language is clear and unambiguous. The legislature clearly intended that uninsured and underinsured motorist coverage be a single coverage.

■ The commissioner argues that the language, "For purposes of this subdivision," indicates that the legislature did not intend the coverages to be combined for *all* purposes. The commissioner does not provide examples of purposes, other than those set forth in subdivision 3a, for which the coverages would be separate. Subdivision 3a itself is entitled "Uninsured and underinsured motorist coverages." It is the provision which, among other things, requires insurers to include these coverages in their policies, provides that "when combined" the coverages shall provide certain minimum levels of coverage, and re-

quires owners of motor vehicles registered or principally garaged in this state to maintain the coverages. Whether or not the legislature intended the coverages to be separate for some other purpose, it has clearly and unambiguously expressed its intent that they be a single coverage for purposes of the subdivision that requires all automobile insurance policies filed for approval in this state to contain those coverages.

The commissioner also relies on references in subdivision 3a to "uninsured and underinsured coverages" as evidencing a legislative intent that these coverages be separate. However, this argument ignores the fact that the two coverages are defined separately in the No-Fault Act. *See* Minn. Stat. § 65B.43, subds. 18, 19 (Supp.1985). Furthermore, as the administrative law judge pointed out in his memorandum, it also:

> ignores the fact that underinsured motorists' coverage was being mandated for the first time in Minnesota and was being written into the existing uninsured motorists' statutory provisions. It was for this reason that uninsured and underinsured motorists' coverages were grammatically structured as plural and additive.

If the legislature intended to require a separate coverage for underinsured motorists' coverage, it could have easily stated so.

6. In support of their argument that uninsured and underinsured coverages should be combined, petitioners elicited at the contested case hearing the testimony of Senator Petty, chief author of chapter 168, and introduced as exhibits transcripts of statements made by Senator Petty both in committee and before the full Senate. The commissioner argues that this evidence is inadmissible.

Traditionally, statements made by individual legislators were inadmissible as aids in construing the meaning of a statute. *See Bragg v. Chicago, Milwaukee & St. Paul Railway Co.,* 81 Minn. 130, 133, 83 N.W. 511, 512 (1900); 2A Singer, *Statutes and Statutory Construction* § 48.13 (4th ed. 1985). This general rule has been eroded, however. Statements made by individual legislators in committee or debate are now generally admissible. *See National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 1266, 18 L.Ed.2d 357 (1967); *Twin Ports Oil Co. v. Pine Oil Co.,* 26 F.Supp. 366, 373 (D.Minn.1939). Statements made in committee or floor debate by the sponsor of a bill are to be given substantial weight in ascertaining legislative intent. *Federal Energy Administration v. Algonquin SNG, Inc.,* 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976); *Voyageurs National Park Association v. Arnett,* 609 F.Supp. 532, 538 (D.Minn.1985). Senator Petty was the chief author of the bill at issue. The transcripts of his statements in committee and on the floor were clearly admissible.

In addition, the testimony of Senator Petty regarding the procedure followed in enacting the various regular and special session bills was relevant and admissible in ascertaining the contemporaneous legislative history, as required by Minn.Stat. § 645.16(7) (1984), and the circumstances under which the law was enacted, as required by Minn.Stat. § 645.16(2).

The testimony of the legislators at the contested case hearing as to the intent of the legislature when it enacted the bills was inadmissible, however. Subsequent testimony by individual legislators regarding legislative intent is inadmissible in construing a statute. *See Washington County v. AFSCME,* 262 N.W.2d 163, 167 (Minn. 1978); *Singer, supra,* § 48.16. We have therefore not relied on this testimony in reaching our decision in this case.

## DECISION

The final decision of the Commissioner of Commerce is reversed in all respects. We order the commissioner to approve petitioners' policy forms, which are in conformance with this opinion, as submitted.

Reversed.