STATE of Minnesota by David BEAU-LIEU, Commissioner, Department of Human Rights, Respondent,

v.

Donald J. CLAUSEN, Relator.

No. C0-92-733.

Court of Appeals of Minnesota.

Oct. 20, 1992.

Review Denied Dec. 15, 1992.

---

Hubert H. Humphrey III, Atty. Gen., Erica Jacobson, Special Asst. Atty. Gen., St. Paul, for respondent.

Jeffrey L. Sikkema, Dorsey & Whitney, Minneapolis, for relator.

Gayle Dixon, Thaddeus J. Holmquist, Minnesota AIDS Project, Minneapolis, amicus curiae.

Michael T. Isbell, Evan Wolfson, Lambda Legal Defense and Education Fund, Inc., New York City, amicus curiae.

Considered and decided by HUSPENI, P.J., and LANSING and KLAPHAKE, JJ.

## OPINION

KLAPHAKE, Judge.

Respondent State of Minnesota by David Beaulieu, Commissioner, Department of Human Rights (Commissioner), brought this action against relator Donald J. Clausen (Clausen). The Commissioner alleged Clausen committed an unfair discriminatory practice in violation of Minn.Stat. § 363.03, subd. 3 (1990), when he refused to provide dental services to J.B., an individual who tested positive for Human Immunodeficiency Virus (HIV).

Following a hearing, the Administrative Law Judge (ALJ) ruled against Clausen, and ordered him to cease and desist from discriminating against persons with HIV or Acquired Immune Deficiency Syndrome (AIDS) in his dental practice. The ALJ further ordered Clausen to pay damages of $10,000 to J.B. for mental anguish and suffering, and to pay a $5,000 civil penalty to the Commissioner.

Clausen has obtained a writ of certiorari and seeks review of the ALJ's decision. We affirm.

## FACTS

Clausen obtained his dentistry degree in 1969 and began practicing at his current location in downtown Minneapolis in late 1986. He advertises his dental practice in the yellow pages of the telephone directory, and describes his services as "General and Restorative Dentistry." He offers general dental services to the public and usually accepts as a patient any person who requests dental services.

Between 1986 and 1990, Clausen treated J.B. approximately 20 times. These appointments were for routine examinations and teeth cleaning, fabrication and insertion of a denture, and filling of a tooth.

On March 11, 1987, J.B. tested positive for HIV. However, he is asymptomatic and does not have AIDS or any other infections or complications as a result of having HIV.

In February 1989, J.B. completed a dental history for Clausen and disclosed that he was HIV-positive. Clausen continued to treat J.B., who had two routine appointments with Clausen in 1989, and one in March 1990. At the March 1990 appointment, J.B. advised Clausen that he was taking the drug azidothymidine (AZT).

J.B. scheduled a routine examination and teeth cleaning for September 1990. During this type of appointment, Clausen examines soft tissue, including a periodontal probing. A hygienist also removes hard and soft deposits. Such procedures may be invasive, and often cause bleeding of a patient's gums and soft tissue.

Prior to J.B.'s September 1990 appointment, Clausen directed his receptionist to cancel J.B.'s appointment and refer him to the University of Minnesota (University) for dental care. Clausen was aware that the University had studied the appropriate method of treating HIV-positive patients. Clausen had previously referred two other patients with HIV to the University.[1]

J.B. decided not to go to the University for dental care. During a chance encounter with Clausen and his receptionist in 1991, J.B. told them that he had a problem with his denture. Clausen's receptionist told J.B. they would repair it for him. J.B. refused the offer, and went to another private dentist for the work. However, he has not had his teeth cleaned since September 1990.

Clausen made his decision to refer J.B. without any specific information about J.B.'s condition. Clausen did not consult with J.B.'s medical doctor or with anyone else regarding his referral of J.B. Clausen testified he believed he should refer HIV-positive patients in order to protect their health and because of his lack of knowledge about the disease.

The evidence presented at the hearing established that Clausen's dental office employs infection control procedures, commonly called universal precautions, which treat all patients as if they had a transmittable disease. Specifically, Clausen and his staff wear protective clothing and disinfect their equipment.

Dr. John Look, who has a dental degree and a masters degree in epidemiology, testified on Clausen's behalf. Dr. Look has not treated an HIV-positive or AIDS patient since 1988. Dr. Look testified that Clausen's referral was valid because infection control procedures for HIV-positive patients should include treatment in an isolation room to prevent the patient's exposure to aerosols from adjacent rooms. Dr. Look explained that these aerosols could be potentially dangerous to an HIV-positive individual with a compromised immune system.

The Commissioner called two experts. The first, Dr. William Keith Henry, is a medical doctor and director of the AIDS/HIV Clinic and Programs at St. Paul–Ramsey Medical Center. The second, Dr. Paul Walker, is a dentist and director of the Hospital Dental Clinic at the University. Both have extensive experience in the research and treatment of HIV and AIDS. Both testified that there is no medical reason to treat HIV-positive patients in isolation rooms. Both further testified there is no medical reason for a dentist who uses universal precautions to refer an HIV-positive patient like J.B. to the University, even if he is being treated with AZT.

All of the experts were familiar with the position taken by the American Dental Association (ADA), which stated:

> Patients with HIV infection may be safely treated in private dental offices when

---

1. For a period of time, the University had treated HIV-positive patients in special isolation rooms. However, in January 1990, the University abandoned the use of isolation rooms and began using universal precautions in its operations.

appropriate infection control procedures are employed. A sound approach to the treatment of infectious patients requires an assessment of the patient's condition based on reasonable and informed medical judgments, given the state of medical knowledge at the time.

American Dental Ass'n, *Facts About AIDS for the Dental Team* 15 (2d ed. Oct. 1988). The infection control procedures recommended by the ADA include the same types of universal precautions utilized by Clausen and his staff, and do not include the use of isolation rooms. *See id.* at 8–9.

In concluding that Clausen unlawfully discriminated against J.B. on the basis of his disability, the ALJ determined that J.B. is disabled within the meaning of the Minnesota Human Rights Act (Act), and that Clausen's dental office is a place of public accommodation within the meaning of the Act. The ALJ further determined that the Commissioner proved a prima facie case of discrimination; and that while Clausen offered legitimate, nondiscriminatory reasons for refusing to treat J.B., those reasons were merely pretexts for discrimination.

### ISSUES

1. Did the ALJ err in concluding J.B. is "disabled" within the meaning of the Act under Minn.Stat. § 363.01, subd. 13?

2. Did the ALJ err in concluding that Clausen offered legitimate, nondiscriminatory reasons for his actions, but that those reasons were merely pretexts for discrimination?

### ANALYSIS

■ This court may reverse or modify an ALJ's decision if it is in violation of constitutional provisions, in excess of an agency's authority or jurisdiction, arbitrary or capricious, unsupported by substantial evidence, or affected by an error of law.

2. On appeal, Clausen does not challenge the ALJ's determination that Clausen's dental office is a place of public accommodation under Minn.Stat. § 363.01, subd. 13, and that this case was properly brought under Minn.Stat. § 363.03, subd. 3. Instead, for the first time on appeal,

Minn.Stat. § 14.69 (1990). The substantial evidence test requires the appellate court to evaluate the evidence "in view of the entire record as submitted." *Minnesota Power & Light Co. v. Minnesota Pub. Util. Comm'n,* 342 N.W.2d 324, 332 (Minn. 1983) (quoting Minn.Stat. § 14.69(e) (1982)). In reviewing questions of law, the court is free to substitute its judgment for that of the agency. *Blue Earth County Welfare Dep't v. Cabellero,* 302 Minn. 329, 341, 225 N.W.2d 373, 380 (1974).

### I

Clausen first argues the Commissioner failed to show J.B. is disabled under the Act.[2] Minn.Stat. § 363.01, subd. 13 (1990) defines "disability" in pertinent part as

any condition or characteristic that renders a person a disabled person. A disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities, * * * (3) or is regarded as having such an impairment.

For the purposes of this appeal, Clausen concedes J.B. has an "impairment" which affects his hemic and lymphatic system. However, under the first definition quoted above, the parties dispute whether J.B. is "materially limited" in any "major life activities."

In determining whether an individual is limited in any "major life activities," the supreme court found "helpful" a definition which includes " 'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' " *State by Cooper v. Hennepin County,* 441 N.W.2d 106, 110 (Minn.1989) (quoting 45 C.F.R. § 84.3(j)(2)(ii) (1988)). Clausen notes that this list includes only functional activities, and does not include changing one's behavior to avoid infecting others.

peal, he argues that his dental office is more appropriately a "trade or business" under Minn. Stat. § 363.03, subd. 8a. This issue was not argued to or addressed by the ALJ, and we decline to consider it on appeal. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988).

■ However, this list of major life activities is merely illustrative, and not exclusive. As the ALJ noted in its memorandum:

> It is Dr. Henry's experience that people with HIV infections are limited in several major life activities. They are recommended not to have unprotected inserted sexual intercourse and are recommended not to have children. * * * They become poor candidates for life, health or disability insurance. HIV infected persons have a shortened expected life span which from the time of initial infection may be ten to 12 years. Accordingly, certain career choices [which] require extensive training would not make sense. HIV infected persons who are on medication require visits to the clinic which takes time away from work.

In addition to these physical limitations, HIV-positive individuals are unjustifiably and "widely stereotyped as indelibly miasmic, untouchable, physically and morally polluted." *Cain v. Hyatt*, 734 F.Supp. 671, 678 (E.D.Pa.1990). Such social exclusion is also a material limitation on major life activities. We therefore agree with the ALJ and conclude that because HIV-positive individuals like J.B. are materially limited in several major life activities, they are disabled within the meaning of Minn.Stat. § 363.01, subd. 13(1).[3]

## II

■ In evaluating discrimination claims, courts utilize the three-step analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[4] This analysis requires that (1) a plaintiff prove a prima facie case of discrimination; (2) a defendant offer legitimate, nondiscriminatory reasons for its actions; and (3) the plaintiff prove that

those reasons were a mere pretext for discrimination. *Sigurdson v. Isanti County*, 386 N.W.2d 715, 720 (Minn.1986). Clausen does not challenge the ALJ's determination that the Commissioner established a prima facie case of discrimination.

To meet his burden under the second step, Clausen offered the following reasons for his conduct: (1) his actions were an appropriate referral, rather than denial of services; and (2) his actions constitute a reasonable medical or dental judgment in light of the facts. These reasons appear to be legitimate and nondiscriminatory.

At the third step of the *McDonnell Douglas* analysis, the plaintiff must show by a preponderance of the evidence that the defendant's proffered reasons were merely a pretext for discrimination. *See Sigurdson*, 386 N.W.2d at 720. The Commissioner may show pretext with direct evidence that it is more likely Clausen's motives were improper or biased, or with indirect evidence that Clausen's explanations were unworthy of credence. *Id.*

Here, the Commissioner presented no direct evidence of pretext. Instead, the Commissioner presented indirect evidence, consisting primarily of the testimony of expert witnesses and statements published by the ADA, to rebut Clausen's proffered reasons.

Clausen's first proffered reason was that his referral of J.B. to the University was appropriate and not a denial of services. However, the evidence presented by the Commissioner established that Clausen's "referral" failed to meet the standards for an appropriate dental referral. As noted by the ALJ,

> [J.B.] was scheduled for a general examination and teeth cleaning which was not outside of Dr. Clausen's area of expertise. He would not have made a similar

---

3. The parties also discuss whether J.B. is disabled because he is "regarded" as having an impairment that materially limits major life activities. *See* Minn.Stat. § 363.01, subd. 13(3). Because we conclude he is disabled under Minn. Stat. § 363.01, subd. 13(1), we do not decide whether he is also "regarded" as having such an impairment.

4. Clausen argues this three-step analysis is inapplicable once a trial on the merits has been completed. *See United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). However, Minnesota appellate courts use the *McDonnell Douglas* analysis when reviewing a judgment after trial on the merits. *See, e.g., Sigurdson v. Isanti County*, 386 N.W.2d 715, 719–22 (Minn.1986).

referral for a person who was not HIV infected. When Dr. Clausen's conduct is compared against the ADA recommendations it must be noted that he failed to consult with [J.B.'s] physician concerning his health status to attempt to determine if remaining with Dr. Clausen would somehow compromise his health. Lastly, as Dr. Walker testified, normally a patient returns to the primary care provider after a referral to a specialist. In this case, Dr. Clausen simply advised [J.B.] that he would no longer provide dental services.

Thus, the ALJ could properly disbelieve Clausen and determine that his referral was merely a pretext for discrimination.

Clausen's second proffered reason was that he was exercising reasonable medical judgment in light of what is known about HIV. Clausen's position is summarized by the ALJ as follows:

Dr. Clausen testified that he referred [J.B.] to the University because he began to realize that there were some things that he didn't know about the HIV disease process. He believed that as a natural course of the disease the immune system would progressively break down and Dr. Clausen was concerned that dental treatment might be dangerous to the patient's health. He knew that there were experts at the University who knew more about HIV and the treatment of such patients than he did. He was concerned about the possibility of introducing bacteria into [J.B.'s] bloodstream. When Dr. Clausen learned that [J.B.] was taking AZT he was not sure exactly what the ramifications were, but assumed that he was taking the drug because of his immune system.

Clausen's claim that it would have been unsafe for him to continue to treat J.B. is similar to a "serious threat" defense, which

may be asserted when an employer relies upon competent medical advice that an employee's condition poses a reasonably probable risk of serious harm.[5] *State, Dep't of Human Rights v. Hibbing Taconite Co.,* 482 N.W.2d 504, 507 (Minn.App.1992) (citing *Lewis v. Remmele Eng'g, Inc.,* 314 N.W.2d 1, 4 (Minn.1981)), *pet. for rev. denied* (Minn. May 15, 1992). While such a defense is not specifically available in a case alleging disability discrimination under the public accommodation provision, the concepts involved are pertinent to our analysis.[6]

██ Although there was some disagreement on certain aspects of the HIV infection and its treatment, no expert testified that referral of J.B. was necessary because of a reasonably probable risk of serious harm to J.B. or to others. Indeed, the evidence tended to show that any such risk was minimal as long as a dentist utilized universal precautions.

Moreover, the Commissioner demonstrated that Clausen made his decision without obtaining any competent medical advice. Had Clausen contacted the University, he would have been informed that the University no longer used isolation rooms, and had been following universal precautions since January 1990. Had Clausen contacted J.B.'s physician, he would have been informed that J.B.'s immune system was not compromised and that J.B. could be safely treated in a private dental office. Or, had Clausen contacted the ADA or any number of experts on HIV, he would have been informed that an HIV-positive individual may be safely treated in a private dental office which utilizes universal precautions.

Clausen thus appears to have acted solely upon his own uninformed and, as the medical evidence in this case clearly estab-

---

**5.** Clausen insists the ALJ erred by characterizing his reason for referring J.B. as a "serious threat" type of defense. For the first time on appeal, he argues the ALJ should have considered that reason to be a "legitimate business purpose" under Minn.Stat. § 363.03, subd. 8a. We decline to consider theories not raised below. *Thiele,* 425 N.W.2d at 582.

**6.** In 1992, the legislature amended the public accommodation provision to create a "safety" defense if an individual "poses a direct threat to the health or safety of others." 1992 Minn.Laws ch. 527, § 14. However, this amendment was not in effect in 1990 and does not apply to this case.

lished, unjustified beliefs. While the state of medical knowledge in this area is constantly changing, Clausen had some obligation to educate himself on those changes, so that he could make an informed medical decision. Since Clausen's proffered reason had little or no medical basis, the ALJ could properly determine his explanation was unworthy of credence and merely a pretext for discrimination.

## DECISION

The ALJ's decision is affirmed.

Affirmed.