Dear Ms. Wexler:
You have requested our opinion on the extent to which anti-discrimination laws affect the right of an electrologist to restrict her clinical practice in certain ways. Specifically, you ask whether an electrologist may refuse services to individuals based on sex, age, human immunodeficiency virus ("HIV") status, or any other criteria.
Our opinion is as follows: Refusal of service or any other type of discriminatory conduct based on race, creed, sex, age, color, national origin, marital status, or disability — including HIV status — is unlawful. An electrologist generally may not take these factors into account when providing services to members of the public. However, an electrologist does not unlawfully discriminate on the basis of sex if she declines to provide intimate personal services to men. In addition, an electrologist may take account of neutral factors like prior contact with a client in deciding whether or when to provide particular services.
 I Background
Electrolysis is the "removal of excessive hair from the body." Dorland's Illustrated Medical Dictionary 426 (26th ed. 1981). Under § 6-102(h) of the Health Occupations ("HO") Article, Maryland Code, the term "practice electrology" means "to remove hair permanently through the use of electrical instruments." Electrolysis is done by passing a fine needle down along the hair shaft to the follicle. An electric current sent through the tip of the needle sets up a chemical reaction that permanently destroys the follicles and prevents regrowth of the hair. Dorland's at 426.
An electrologist is considered a health care professional. COMAR § 10.52.11.02B(4). The Board of Electrologists, like other health care regulatory boards, is part of the Department of Health and Mental Hygiene. § 2-106 of the Health-General Article and HO § 6-201.
Electrologists are almost all female. To be exact, of the Board's 192 licensees, 188 are female. As we understand the facts, many electrologists have special restrictions that affect male clients. Some confine their practice to females only, for reasons of propriety. Others restrict their practice for safety reasons, because they often work alone at night and fear harm from male assailants. Often, electrologists who have male clientele will only provide electrolysis above the waist, because many do not use assistants and would not have a witness to counter any claims of sexual impropriety.
These restrictions appear to be authorized by the regulatory code of ethics governing the practice of electrology. According to COMAR 10.53.01B, an electrologist is "free to choose whom to serve."
This provision reflects the common law principle that a business owner is generally free to exercise discretion over the type of customers to whom services are provided. Although anti-discrimination laws limit this discretion, they have not eliminated it. See Silbert v. Ramsey, 301 Md. 96, 104,482 A.2d 147 (1984). Thus, a business owner may deny service to a customer who fails to conform to the usual and regular requirements and standards of the establishment. Silbert, 301 Md. at 104.[1]
 II Public Accommodations Law
"It is unlawful for an owner or operator of a place of public accommodation or an agent or employee of the owner or operator, because of the race, creed, sex, age, color, national origin, marital status or physical or mental handicap of any person, to refuse, withhold from, or deny to such person any of the accommodations, advantages, facilities and privileges of such place of public accommodation." Article 49B, § 5 of the Maryland Code. See also Coalition for Open Doors v. Annapolis LodgeNo. 622, Benevolent Protective Order of Elks, 333 Md. 359, 379,635 A.2d 412 (1994). The Legislature has extended the duty not to discriminate to places of public accommodations that, while not public utilities, like them are open to the public. Barnes v.State ex rel. Pinkney, 236 Md. 564, 576, 204 A.2d 787 (1964). In pertinent part, a public accommodation is defined as "a retail establishment, whether offering goods, services, entertainment, recreation, or transportation." Article 49B, § 5(d)(1)(iii).
Because an electrologist provides services to consumers, the Human Relations Commission has informally taken the position that an electrologists's office is a "public accommodation" within the meaning of the Public Accommodations Law and is therefore subject to the jurisdiction of the Human Relations Commission. We accept this application of the Public Accommodations Law, which is supported by out-of-state authority. See State by Beaulieu v.Clausen, 491 N.W.2d 662, 665 (Minn.App. 1992) (a dentist's office is a place of public accommodation). See also Washington v.Blampin, 38 Cal.Rptr. 235, 238 (Cal.App. 1964) (physician's services held to be within the term "services in all business establishments," so as to render a physician liable for refusal to furnish medical services based solely upon race). But see Sattlerv. City of New York Comm'n on Human Rights, 554 N.Y.S.2d 763, 766
(N.Y.Sup.Ct. 1990), appeal denied, 594 N.Y.S.2d 715 (N.Y.App.Div. 199 2) (private dentist office was not a "place of public accommodation" within meaning of law because office did not fall within statutory phrase "wholesale or retail stores and establishments dealing with goods or services of any kind"). Seegenerally Annotation, What Businesses or Establishments FallWithin State Civil Rights Statute Provisions ProhibitingDiscrimination, 87 A.L.R.2d 120 (1963).[2]
We shall discuss two of the categories of this law, sex and "handicap," in more detail below. As for the rest of the categories — race, creed, age, color, national origin, and marital status — there is no need for detailed discussion.[3] An electrologist may not alter the terms of doing business simply because a customer is of a particular race or color, holds a particular religious faith, is young or old,[4] comes from a particular country, or is married or single.
 III Distinctions Based on Gender
Article 49B and other civil rights statutes that prohibit discrimination based on sex reflect the public policy mandate and objective that men and women be treated equally. See generally 14 C.J.S. Civil Rights § 23 (1991).[5] The Public Accommodations Law generally prohibits a variance in services based solely upon a difference in gender. Thus, for example, in Peppin v. WoodsideDelicatessen, 67 Md. App. 39, 48, 506 A.2d 263 (1986), the Court of Special Appeals applied a comparable county law to a tavern's "Skirt and Gown Night," which gave a 50% discount to any patron wearing a skirt or gown. This practice, the Court held, constituted unlawful sex-based discrimination. See also, e.g.,Koire v. Metro Car Wash, 219 Cal.Rptr. 133, 135-36 (Cal. 1985) (California human rights act prohibited car wash and nightclub from offering price discounts to women without offering similar discounts to men); Hales v. Ojai Valley Inn Country Club,140 Cal.Rptr. 555, 557 (Cal.App. 1977) (restaurant dress code that required men, but not women, to wear jackets and ties in order to be served violated human rights act).
Nevertheless, there are instances where public policy warrants differential treatment between men and women. Koire v.Metro Car Wash, 219 Cal.Rptr. at 141. For example, some sex-segregated facilities, such as restrooms, shower facilities, changing rooms, and sleeping accommodations, may be justified by the right to personal privacy. See York v. Story, 324 F.2d 450,455 (9th Cir. 1963), cert. denied, 376 U.S. 939 (1964) (most basic subject of privacy is shielding the body from strangers, particularly those of the opposite sex).
Different treatment of men and women may also be legally justified where the services provided are of a highly personal nature. Laws against gender-based employment discrimination, for example, do not preclude an employer from hiring only employees of one gender to render intimate personal services to patrons of that gender. See, e.g., Local 567 American Fed. of State, County Mun.Employees v. Michigan Council 25, 635 F. Supp. 1010 (E.D. Mich. 1986) (privacy rights justify a bona fide occupational classification for a worker who must provide personal hygiene care).[6] Of course, the claimed intimacy must be derived from relevant physical differences between men and women and genuine cultural norms about privacy. In Maryland State Bd. ofBarber Examiners v. Kuhn, 270 Md. 496, 508, 312 A.2d 216 (1973) the Court of Appeals rejected the argument that there are physiological differences between men and women sufficient to justify a statutory prohibition against cosmetologists offering to men the services that they provide for women.
Electrolysis, the removal of hair from the human body, can be of a highly personal nature. A requested service may involve the removal of hair from private areas of an individual's body. Given the very personal nature of this type of procedure, it would not be unreasonable or contrary to the public policy reflected in the Public Accommodations Law for an electrologist to handle the performance of such procedures on men and women differently. So, for example, a female electrologist may limit the performance of electrolysis on men to areas above the waist.[7]
You also inquire whether safety concerns would justify different treatment of men and women. A woman's concern for her personal safety is reasonable. Over ninety percent of the sexual assaults committed in this country are committed by men. U.S. Department of Justice, Bureau of Justice Statistics, Sourcebook ofCriminal Justice Statistics — 1994, at 386, 468 (1995). The concern for one's safety, however, must be weighed against the consequences of accepting as lawful the denial of service to all males.
The basic right guaranteed by Article 49B, § 5(a), equal access to public accommodations, would be undermined if a place of public accommodation could exclude an entire protected class of the public because the owner or operator of the establishment had some reason to believe that the class, taken as a whole, presents greater problems than other groups. The point is illustrated by a Washington case involving a race-based exclusion policy. In Lewisv. Doll, 765 P.2d 1341 (Wash.App. 1989), the owner of a 7-Eleven developed a policy of refusing to serve any African-Americans, because there had been a series of shoplifting incidents at the store involving blacks. 765 P.2d at 1342. The court rejected this justification defense: "Refusal of service [can] apply only to situations where there is objective evidence a particular individual is engaging in or has in the past engaged in improper conduct. Refusal of service cannot be predicated solely [on] race." 765 P.2d at 1345. See also Marina Point, Ltd. v. Wolfson,180 Cal.Rptr. 496, 507 (Cal. 1982) (landlord could not exclude families with minor children on the basis of the generalized assessment that children as a whole are more likely to commit misconduct than some other class of the public).
Thus, an electrologist may not deny services to male clients simply because of the generalization, accurate though it is, that men are much more likely than women to commit sexual assaults.See Los Angeles Dep't of Water Power v. Manhart, 435 U.S. 702,708 (1978) (even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply); Easebe Enterprises, Inc. v. Rice,190 Cal.Rptr. 678, 681-82 (Cal.App. 1983) (rejecting the contention that, because a policy founded on gender-based discrimination is sometimes consistent with everyday realities, the policy did not constitute arbitrary discrimination under the California human rights act).[8]
A policy of excluding all males during evening hours would likewise amount to prohibited discrimination. As is true of a blanket exclusion, such a policy makes the fact of membership in a class, males, determinative of the terms of a business relationship. Just as a fearful shopkeeper may not exclude all African-Americans during evening hours, so a fearful electrologist may not exclude all males.
A different policy would be lawful, one that does not rely on the fact of gender and yet serves to diminish the risks that understandably concern electrologists. For example, an electrologist may limit evening-hours clients to referral clients or repeat clients only. A legitimate business criterion of this kind would not run afoul of the Public Accommodations Law.
 IV Discrimination Based on HIV Status
A. Public Accommodations Law
Article 49B, § 5 provides that it is unlawful to refuse public accommodations based on physical handicap. HIV infection is a handicap, according to the Human Relations Commission. COMAR § 14.03.02.02. Accord State by Beaulieu, 491 N.W.2d at 666. Therefore, the practice of denying services to an individual solely on the basis of HIV-positive status is actionable under Article 49B, § 5.
The Public Accommodations Law is not intended to obstruct the legitimate exercise of professional judgment by an electrologist. Nor does it require that every electrologist treat every patient. Some individuals may have conditions associated with AIDS, for example, that would make electrolysis medically inadvisable. The Public Accommodations Law permits some deference to bona fide medical judgment. Where the denial of services is based on an individual's disability, however, the Human Relations Commission must make the determination whether a reasonable accommodation might have been made. See Hurwitz v. New York City Comm'n onHuman Rights, 535 N.Y.S.2d 1007, 1013 (1988), aff'd,553 N.Y.S.2d 323 (N.Y.App.Div.), appeal denied, 558 N.Y.S.2d 891 (1990).
B. Electrology Practice Act Prohibition
HO § 6-312 (a)(23) provides as follows:
 Subject to the hearing provisions of § 6-314 of this subtitle, the Board [of Electrologists] may deny a license to any applicant, reprimand any licensee, place any licensee on probation, or suspend or revoke any license if the applicant or licensee:
. . .
 (23) Refuses, withholds from, denies, or discriminates against an individual with regard to the provision of professional services for which the licensee is licensed and qualified to render because the individual is HIV positive.
In 77 Opinions of the Attorney General ___ (1992) [Opinion No. 92-018 (June 9, 1992)], we concluded that HO § 7-317(a)(27), an identically worded provision in the Morticians Act, subjects "[a] mortician . . . to disciplinary action if the mortician `discriminates' against an individual who is HIV-positive." Opinion No. 92-018, at 4. Likewise, an electrologist's practice of refusing services to, or imposing special costs on, people who are HIV-positive violates HO § 6-312(a)(23) and may subject the electrologist to discipline.
In Opinion No. 92-018, we concluded that discrimination on the basis of HIV-positive status was unjustifiable in part because a mortician is required to employ universal precautions. Thus, there was no rational basis for refusing to provide service or charging higher fees when a deceased person was HIV-positive. Opinion No. 92-018, at 5-7. Likewise, HO § 6-312(a)(28) requires electrologists to comply with the Centers for Disease Control's guidelines on universal precautions. See Guidelines for Preventionof Transmission of Human Immunodeficiency Virus and Hepatitis BVirus to Health-Care and Public Safety Workers, 38 Morbidity and Mortality Weekly Rep. 1 (1989).[9] While the practice of electrolysis may not involve the volume of blood or bodily fluids as does the practice of mortuary science, electrologists nonetheless use instruments during the procedure that require the need for safety precautions.[10] Accordingly, there appears to be no reasonable basis for treating HIV-positive persons differently, and such a practice may subject an electrologist to discipline. See Beaulieu, 491 N.W.2d at 667
(dentist's proffered reasons for refusing to treat an individual who had tested positive for HIV were merely pretext for discrimination where expert testimony established that any risk to patient or dentist was minimal as long as dentist used universal precautions).
C. Americans With Disabilities Act
Title III of the Americans With Disabilities Act ("ADA"),42 U.S.C. § 12181 et seq., prohibits discrimination against persons with disabilities in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. 42 U.S.C. § 12182. "HIV infection, whether or not it has developed into AIDS, is a `disability' under the ADA." Opinion No. 92-018, at 8 (citing28 C.F.R. § 36.104). A professional office of a health care provider is expressly included within the definition of "public accommodation." 42 U.S.C. § 12181(7)(F).
In concluding that the denial of services or the imposition of higher costs on HIV-positive persons violated the ADA, we observed as follows:
 Under the ADA a [health professional] is to make reasonable modifications in policies, practices, and procedures to avoid discrimination. 42 U.S.C. § 12181(b)(2)(A)(iii). [Health care professionals] may only be excused from compliance if they can demonstrate that taking such steps would result in an "undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). It is unlikely that the use of added precautions such as disposable gloves is a demonstrably undue burden, particularly in light of newly enacted HO [§ 6-312(a)(28)], which mandates the use of universal precautions.
In our view, an electrologist who denies services to persons because of their HIV-positive status violates the ADA. Opinion No. 92-018, at 8.
 IV Conclusion
In summary, it is our opinion that refusal of service or any other type of discriminatory conduct based on race, creed, sex, age, color, national origin, marital status, or disability including HIV status — is unlawful. An electrologist generally may not take these factors into account when providing services to members of the public. However, an electrologist does not unlawfully discriminate on the basis of sex if she declines to provide intimate personal services to men. In addition, an electrologist may take account of neutral factors like prior contact with a client in deciding whether or when to provide particular services.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions Advice
 Kimberly Smith Ward Assistant Attorney General
[1] In Silbert, the Court of Appeals held that an individual who had been convicted of violating the lottery laws could be barred from attending horse races at a racetrack, to protect the integrity and honesty of betting. Out-of-state cases on point include Ross v. Forest Lawn Memorial Park,203 Cal.Rptr. 468 (Cal.App. 1984) (cemetery could exclude "punk rockers" from a private funeral at the request of the mother of the deceased, given the sensitive nature of the services offered by the cemetery);Muslow v. A.G. Edwards Sons, Inc., 509 So.2d 1012 (La.), writ denied,512 So.2d 1183 (1987) (exclusion of plaintiff from brokerage to prevent the excessive use of customer services by non-customers was reasonable and not contrary to public policy); and Bonomo v. Louisiana Downs, Inc., 337 So.2d 553 (La. 1976) (barring of convicted bookmakers from a race track in order to maintain the public's confidence in horse racing and pari-mutuel betting is not against public policy or constitutional principles of arbitrariness and capriciousness)
[2] Article 49B, § 8 specifically provides that "it is unlawful for any person, business, corporation, partnership, copartnership or association or any other individual, agent, employee, group or firm which is licensed or regulated by a unit in the Department of Labor, Licensing, and Regulation as set out in § 2-108 of the Business Regulation Article to refuse, withhold from, deny or discriminate against any person the accommodations, advantages, facilities, privileges, sales, or services because of the race, sex, creed, color, national origin, martial status, or physical or mental handicap of any person." Electrologists are not regulated by the Department of Labor, Licensing, and Regulation, but rather by the Department of Health and Mental Hygiene. See HG § 2-106 (a)(13) and HO § 6-201. Nonetheless, for the reasons stated in text, an electrologist's office falls within the purview of the Public Accommodations Law.
[3] In light of the clarity of State law, we need not discuss the impact of pertinent federal law.
[4] You do not indicate in your request letter the reason why an electrologist might wish to treat clientele differently based upon their age. However, in our view offering discount prices to an elderly client would not be against public policy and would not violate the Public Accommodations Law.
[5] The Equal Rights Amendment, Article 46 of the Declaration of Rights, has the same objective. However, Article 46 does not apply to purely private activity; "State action" of some kind is required. See Burning Tree Club, Inc. v. Bainum,305 Md. 53, 63-4, 501 A.2d 817 (1995); 68 Opinions of the AttorneyGeneral 164 (1983).
[6] Other examples include: Norwood v. Dale MaintenanceSystem, Inc., 590 F. Supp. 1410 (N.D. Ill. 1984) (allowing opposite sex attendants into washrooms while in use is an intrusion on personal privacy warranting a sex-based hiring policy); Brooks v. ACF Industries, Inc., 537 F. Supp. 1122 (S.D. Va. 1982) (male gender was a bona fide occupational classification for attendants in bathhouse used exclusively by men); Backus v.Baptist Medical Center, 510 F. Supp. 1191 (E.D. Ark. 1981),vacated as moot, 671 F.2d 1100 (8th Cir. 1982) (hiring of male nurse would invade privacy of obstetrical patients in hospital where nurse was obliged to perform sensitive or intimate tasks).See generally Annotation, Permissible Sex Discrimination inEmployment Based on Bonafide Occupational Qualification (BFOQ)Under § 703(e)(1) of Title VII of Civil Rights Act of 1964
(42 U.S.C. § 2000e-2(e)(1), 110 A.L.R. Fed. 28 (1992).
[7] Article 49B, § 5(f) excludes from coverage "those facilities that are uniquely private and personal in nature, designed to accommodate only a particular sex." This subsection would apply, for example, to a gynecologist or an obstetrician, because the services provided by those health care professionals are designed for a particular sex. The services that an electrologist provides are personal in nature but, unlike the services provided by a gynecologist or an obstetrician, are not designed to accommodate only a particular sex. Thus, an electrologist's office would not likely be deemed by the Human Relations Commission to be within this exclusion under the Public Accommodations Law. However, an electrologist, like a masseuse or a tattoo artist, would be justified in treating men and women differently if called upon perform services on private areas of an individual's body.
[8] Of course, an electrologist may deny services to any client, male or female, who threatens the safety or welfare of the electrologist. See, e.g., Orloff v. Los Angeles Turf Club, Inc.,36 Cal.Rptr. 734, 740-41 (Cal. 1951) (a business may exclude patrons on "reasonable" grounds related to public safety and welfare, e.g., intoxicated persons or persons engaging in boisterous conduct, or lewd and immoral acts).
[9] "Universal blood and body-fluid precautions" or "universal precautions," as defined by CDC, refer to a set of precautions designed to prevent transmission of the HIV, hepatitis B virus (HbV), and other blood-borne pathogens in health-care settings. Under universal precautions, blood and certain body fluids of all patients are considered potentially infectious for HIV, HbV, and other blood-borne pathogens. Universal precautions apply to blood, other body fluids containing visible blood, semen, and vaginal secretions. Universal precautions involve the use of protective barriers such as gloves, gowns, aprons, masks, and protective eyewear, which can reduce the risk of exposure of the health care worker's skin or mucous membranes to potentially infective materials. In addition, under universal precautions, all health care workers are advised to take precautions to prevent injuries caused by needles, scalpels and other sharp instruments or devices. CDC, Hospital Infections Program, HIV Information
at 1.
[10] All health-care workers should take precautions to prevent injuries caused by needles, scalpels, and other sharp instruments or devices during procedures; when cleaning used instruments; during disposal of used needles; and when handling sharp instruments after procedures. To prevent needle stick injuries, needles should not be recapped by hand, purposely bent or broken by hand, removed from disposable syringes, or otherwise manipulated by hand. After they are used, disposable syringes and needles, scalpel blades., and other sharp items should be placed in puncture-resistant containers for disposal. The puncture-resistant containers should be located as close as practical to the use area. All reusable needles should be placed in a puncture-resistant container for transport to the reprocessing area. CDC, Hospital Infections Program, HIVInformation, at 2.
 *Page 74